Our second case is number 22-2018, Hannenkamm, LLC v. United States. Our first case is number 22-2018, Hannenkamm, LLC v. United States. Okay, Mr. Wong. Good morning, Your Honor. May it please the Court, please. Before Hannenkamm voluntarily decided to sell its land, it received the $5.03 million appraisal on which the Forest Service had based this decision of purchase. Okay, but help us with some of the questions that we ask. Of course, Your Honor. What is the promise, the representation, whatever it is that you're saying was waived? So, the Court's first question was what promise did the trial court find to have been breached? I think the best explication of that is in Appendix 12, where the trial court describes it as a obligation to determine the fair market value of Cave Rock Summit via an independent, yellow book compliant appraisal and, in turn, to pay a fair market value. So, that's the promise we understand to have been identified. Okay, but it can't be correct that the contract requires the payment of fair market value. I mean, there's a price in there and there's a representation about how the price was determined, but there's no promise to pay fair market value. So, let's put that aside. So, what is the promise that the price is, or the representation that the price was supported by a fair market value appraisal? Yes, I think that's a fair description, Your Honor. I think that's right. As you say, fair market value is inherently an opinion. And so, I think it's the appraisal certainly is the focus of Hannah Kemp's breach claim, and I think it was also, obviously, the trial court's focus as well. And so, Your Honor— If it's an opinion, and clearly your client had an opinion that the value of the land that he was not required to sell, this isn't a taking, it was an arm's length transaction between two fairly sophisticated buyers and sellers, and they offered him $5 million, and he thought the value of the land was $100 million or more, and now still thinks it's $93 million. Obviously, the opinions differed. No one forced him to enter this contract. Your Honor, we, the government, agree. We agree. We think that this is a voluntary transaction. It's critical to consider. This is not an imminent domain proceeding. It was a free and voluntary transaction. And the force of that point is compounded by Hannah Kemp having received the appraisal, having also received the Forest Service's review of that appraisal, which explained in great detail the Forest Service's bases for accepting the appraisal, and Hannah Kemp also engaged in a back-and-forth with the Forest Service, asking questions about the appraisal, challenging it, creating a, I think, 20-page document. If you had to sum up what you consider to be the conduct that best constitutes the waiver, what would you point us to? Entry into the contract, Your Honor. I think in these circumstances, on these specific facts, where there was no further performance suggested by the Forest Service other than closing the sale and tendering the $5.03 million, everything was fixed prior to Hannah Kemp signing the option contract, which then converted to a sales contract when the Forest Service countersigned. So it is the choice to enter into the contract. The deal is the deal. They had the information they needed. They made the decision. They went forward. Okay. I think we understand what your theory is about the conduct that constitutes the waiver, but what's being waived? Does the contract have an express warranty? Should that be interpreted as a warranty that the price was determined using a fair market value compliant, yellow book compliant appraisal? Is it a representation? What's the promise? What's the representation that's being waived? How do we interpret this contract? Because it's not well written. That probably is something everybody could agree to. Your Honor, the contract can't be interpreted, in our view, as an express warranty. It doesn't say the Forest Service warrants that the Doré appraisal complies with the yellow book. That's not the only verbiage that might suffice, but this is so far from that. What it suggests is a condition, which is that the appraisal will comply with the yellow book that will form the basis for the purchase price. A representation that it's based on in a yellow book compliant appraisal? So, to be sure, the appraisal existed at the point when Hanningham signed this, right? And so that fact is out there, but yet this contract doesn't refer to the appraisal, doesn't claim anything about it. It is obviously phrased as shall be supported by. Was the appraisal attached to the contract? It was not attached to the contract, no, Your Honor. But it was, it indisputably was sent to Hanningham as was the Forest Service's review. So, we don't see there as a way to view this as an express warranty or even an implied warranty. Okay, if it's not an express warranty, what is it? A representation? I think it's a requirement for contracting, Your Honor. It's a condition. So it's something that both parties understood was necessary to go forward. Right, so Forest Service and Hanningham both understood. But if it's a condition, there's certainly a representation that the condition has been satisfied, right, by the government. There are statements. I don't know if, Your Honor, you mean the word representation has a legal significance? I don't think it does. The law of contracts, we didn't include this in the order, but the law of contracts, as I understand it, distinguishes between express warranties and representations, which have different consequences and a different set of legal standards. And I'm not sure that I understand what this is if it's not either, one, an express warranty, or, two, a representation that the appraisal is compliant. Well, Your Honor, the work that we've done since reviewing your order suggests that it could also be, as I said, a condition proceeding, a known requirement for the going forward on the contract. It could also be merely a statement of what the Forest Service was required to do and not confer any right on Hanningham in that sense. No, that's not what the Tribal Court found. It's not a statement of what's required in the future. It's a statement concerning an appraisal that's already been submitted. Yes, and I think we come to the contract language point that you made, Your Honor, which I understand. But on what's known here, whether or not, I suppose ultimately our view, Your Honor, is, first of all, this case is distinguishable from the cases cited in the court's order and also from the West Fed case on which Hanningham relies heavily insofar as those contracts had non-waiver provisions. And that changes the analysis in terms of whether or not any, whatever this, however we want to describe this, whether it could be waived. Again, we don't think it's a warranty. But in any event, there's no non-waiver provision which distinguishes this from those cases. The contract does have a clause that says any warranties, et cetera, et cetera, survive the closing. But that does something different. Well, that is addressed at case law, including it's discussed in Case Bailey of the United States, 134 Fed Claims, 619th. But there's a principle in California and other states that when a real estate transaction closes, the deed is the final contract between the parties. And this provision that I'm talking about, all warranties survive, is directed at that. So it says that the sales contract is still enforceable. But it doesn't answer what the sales contract does. And so no non-waiver provision, that clause is irrelevant to the question of what would promise and whether it could be waived. And so, again, we view those cases as distinguishable to answer, I think, what was the court's third question. Was there a promise in the contract with respect to the appraisal? No. No. And it says, in fact, that the buyer, I think, I don't know if warrants is the word, but has not relied on any representations by the Forest Service other than as contained in this contract. And the contract doesn't say. That doesn't help you. I mean, the question is, is it contained in the contract? Yes, Your Honor. I was talking about whether Pan and Kam could somehow argue reliance on some extrinsic statements. And my point is that they cannot. They're not. They're relying on the specific statement in there. And I don't know how they characterize it. We'll hear from them. But I'm having trouble just saying it's a condition because it's already something that's been provided. It's not as though a condition of the contract is that the government in the future will provide an appraisal. The appraisal was done already. Right. So I don't see how it could be a condition. To me, it's either got to be a warranty or a representation, one or the other. And the consequences of those two are quite different in terms of waiver. Yes. So first of all, Your Honor, I think Pan and Kam is relying on extrinsic statements by the Forest Service for their claims. They're saying that the Forest Service told them that this complied with the Yellow Book, that the Forest Service has reached that conclusion. Pan and Kam says that that is material. So I think extrinsic statements are in play. Not to Your Honor's question, but I think they are in play more generally. With respect to the point that you're saying about the representation, I think one thing that may be hinted at, and this was not addressed below, but one thing that may be hinted at by the clause in which this statement is contained in Appendix 1410 is the possibility that an appraisal could go stale, which does happen, if there's a delay in closing or something like that. The next sentence says, except as may be specifically provided for herein, the property should not be subject to reappraisal due to the passage of time. But it is possible that other things could occur on the land. So I shouldn't say that time alone would do it, which I just said and walk away from. But other occurrences could, I suppose, require a reappraisal. And so I think that that kind of gets to the possibility that conceivably it's a form contract. The facts don't quite match the contract. But I think also there are possibilities where something could occur where there would be a need for a reappraisal. So, yeah. Can we, because your time's running, I mean, one of your arguments here is that the corporal lobe just made a mistake with equitable estoppel. That equitable estoppel does not require that there be an intent on the part of the person to be estopped with the intention. It's not fraud. It's not fraud and inducement. It's an equitable determination that they made a representation, they did an action that you relied on. They signed a contract. And they should be bound by that. And going back and now saying you have to pay them more money than they were willing to accept  We agree, Your Honor. And I would point to the court's decision in Mabus, which we rely on heavily in our briefing, which makes it clear that there doesn't need to be some showing of, as I say, intentional misconduct, which the trial court didn't revisit this post-trial, but in a summary judgment decision says there's no showing of intent to mislead or bad faith. I think that's its phrasing. And so there couldn't be equitable estoppel. But again, Mabus doesn't require that. The point instead, and this comes not from case law in this circuit, is estoppel focuses on the effect on the parties seeking estoppel, not on whether or not, not on the acts of the party to be estoppel. So the effect here was that the Forest Service went forward with this transaction understanding that Hanicam had resolved its issues. The email in which Hanicam says we've decided to accept the Forest Service's offer and we'll be executing the option doesn't reserve rights. It doesn't say we still think you're wrong. You know, we're going to do this, but we'll see you in court. Nothing like that. It just drops everything that had been raised, all of which then carries forward into this litigation in terms of yieldable compliance, and it drops all of that and they execute it and ultimately close the sale. And on those facts, we believe estoppel does lie, irrespective of intent to mislead. All right. Do you want to save the rest of your time? I will reserve my time. Mr. Mazzullo. May it please the Court. Roger Marzullo on behalf of the appellee, Hanicam LLC, and Cross Appellate as well. The trial court found that the appraisal prepared by the Forest Service was not compliant with the Yellow Book. That's a finding of fact and one that the government has not appealed. Remember that the government has only sought reversal on grounds that there was a waiver or that there is an estoppel. And so the examination here is what are the elements of waiver, what are the elements of estoppel? Why do you contend there's no waiver when your client executed the contract that had that set price in there? That's such a good question, Your Honor. It seems to me bizarre to say that by signing a contract, you waived the very provisions that are in the contract. That is, the contract that was signed said that the purchase price shall be supported by a Yellow Book-compliant appraisal. And the government contends without any evidence to support it. Well, when Mr. Hartman signed, he really meant to waive the very provision that's in the contract. He meant to waive what? Do you view this as an express warranty, as a representation, as a condition? Well, I... What is it? It's... I find difficulty putting it in one category or the other. Certainly, it is a promise. And I think in some sense... A promise, but not a promise of future performance, right? That's correct, Your Honor. What it is, is... So, in some senses, it is a representation and warranty that the process established by the Forest Service has, in fact, been properly followed. But it makes a big difference if you're just saying it's a representation. It's not... The number wasn't blank on the contract. If they had given you an option contract saying, we will give you a price in the future that is compliant with an independent appraisal in Yellow Book standards, but there was no number there, and you agreed based on that representation, assuming you would therefore get a fair market value price for this property, and you had no other information about your own property, and you committed, therefore, to making that purchase. And then later, they filled in the number, and you were like, wait a minute, I relied on you, and this number is not big enough. That's not the case here. They said we're going to do the independent appraisal. The number is in the contract when your client signed it, and your client clearly thought it was inadequate based on his own submissions about appraisals and prices and his knowledge of the property and signed it anyway and was willing to go forward with this deal, not saying anywhere, but I'm reserving my right to challenge this number later, but then came back in court and challenged it. How is he not stopped or waived those arguments? The uncontradicted testimony, Your Honor, is that, well, first of all, that the two members of Hanenkam, Mr. Hartman and Mr. Mayer, had never engaged in the investment in real property before. They were not sophisticated. Government at some point says they're sophisticated sellers. They were speculating in property in Tahoe. They bought this property with the intent to sell it, and they came in and said it's worth almost $100 million and sold it for $5 million. No one was forcing them to do that. Not forced, certainly, Your Honor. You're absolutely correct about that. But do remember what the process is. That is that they began these discussions in 2008 with the Forest Service. Following the Forest Service's process, they were required to sign an initial interest document about their interest in selling. Just to kind of add on to the judge's great point down there is there was originally, I believe, a $4 million number put forth, and then it went to a $5 million number, and you were basically like $5 million is good enough. Because the Forest Service appraisers convinced, and this is uncontradicted testimony, Your Honor, as a finding of fact by the trial court, that Mr. Hartman, Mr. Moore, were convinced by the senior appraisers at the Forest Service that indeed this was a Yellow Book-compliant appraisal, and this is the value. This is the only value. They were convinced that that was correct. At that point, they gave up their money. The only value? I mean, just back up a moment. I mean, you can have two Yellow Book-compliant appraisals that reach different numbers, right? Yes, that's correct. Yeah. So there isn't a single number here that would be the right number that people can differ about it, right? Well, people can differ, but the Forest Service process, Your Honor, only allows the Forest Service to prepare this appraisal, and the only amount that can be offered is the results of the appraisal. Remember this contract was— it was to protect the public because the Forest Service is spending government money, and so they have to make sure they've done an appraisal and there's no collusion and that they're doing something that makes sure the tax dollars are being properly sent, and then to come back and say, I sold you my property for an agreed-upon price, but now on your cross-appeal saying, actually, I should have got $93 million for this property. How could we possibly force the government to pay that kind of money when they most likely would have walked away from the deal then? Well, first of all, we're not asking for the court to award any specific amount, but rather to remand for the purpose of allowing the trial court to assess the trophy property premium. But setting that aside for a moment, looking at waiver, what is the evidence that the government has that Hen and Kam, when they signed the contract, were relinquishing their right to a Yellow Book compliant appraisal? That's the problem. The Forest Service says, we are the experts. We have done a Yellow Book compliant appraisal. That's the only thing you are entitled to. And Hen and Kam unsophisticated— No, this was their first. They had never done this kind of a venture before. They supplied an awful lot of information to the appraiser on their own, at least from my reading of the record. There was a tremendous amount of input from the plaintiffs on this. Yes, unsophisticated information, I might say. You will recall, Your Honor, that the Forest Service appraisers made fun of Mr. Hartman. What about the role of—was it Kilpatrick? I'm not sure if I'm saying that right. Wasn't there an expert that you all had? Yes, Your Honor. So can you tell me about that person's role and how that plays in? Yes, he's the one who came up with the—I believe it was $93 million appraisal. And he based his— Was he a qualified appraiser? I'm sorry? Was he a qualified appraiser? Oh, yes. Oh, yes, and he was accepted as an expert. He provided both a report and oral testimony. So that was his testimony, Your Honor. The trial court did not accept his valuation, but the trial court certainly heard his testimony. Mind you, the Forest Service, although they listed their appraiser initially on the witness list, polled him a couple of weeks before trial and did not present any appraisal testimony in this case, anything in support of their appraisal. Why? Because it didn't conform with the Yellow Book. I'd be remiss if I didn't make the point. No one mentioned this. That's not an issue on appeal, right? The government has not appealed the finding that the Yellow Book appraisal was not compliant, right? Yes. A second key point, and the court asked in the order for argument about waivability, let us remember that there are two statutes that govern this particular purchase, the Santini-Burton Act and the Southern Nevada Lands Act. Both require a Yellow Book compliant appraisal, and they require an independent appraisal. The trial court found that the appraisal— But going back again to the fact that we're not arguing here that if their appraisal was inadequate or wrong, and they really aren't contesting that, the fact is they made you an offer and your client accepted it. And there's nothing anywhere in the record that I've seen where they accepted it with any kind of saying, but we're reserving our rights in some way to challenge this amount of money. They just took the deal. They took the deal because they believed the two senior appraisers, McAuliffe and Brower, who said, we are the experts, you don't know what you're talking about, Mr. Hartman, and this is a Yellow Book compliant appraisal, and that is the gold standard. Not only is it the gold standard, it's the legal standard. The Forest Service, Your Honor, could not sign a contract. This contract would not have been enforceable if it didn't comply with Santini-Burton and Southern Nevada Lands Act. Okay, but your problem is this. I mean these investors may have been unsophisticated about real estate. Let's assume for the moment that that's true. But they had available to them a qualified appraiser who advised them about the government's appraisal, and they knew what the arguments were as to why that was noncompliant, and yet they went ahead with the deal anyway, right? Just one fact. No, Your Honor, they did not have expert appraisal help at that point. The information being supplied was by Mr. Hartman, who is a printer by trade. But they got an offer from the government. It was $3 million something, and they said no, and the government went back, and they did it. And they, in fact, I believe indicated who the second appraiser should be, and then those materials were – there was a lot of circulation. There was a lot of discussion about reasonable comparables, whatever, and the government raised their offer to $5 million, and they accepted that. And yet there still seems to be this lingering argument that there's an order of magnitude more value in this property. I just find – it's like me going to CarMax with my car, and they're saying they're giving me a blue book appraisal, and they offer me $2,000, and I think my car is worth $20,000, and I take their offer anyway. I'm not obligated to sell my car to them, and then a week later I sue them saying, well, that wasn't really a good blue book appraisal. Yes, and the difference, Your Honor, is that you can negotiate with CarMax. They could negotiate too. They were not – this was not a taking. They were not forced to sell this property. They could have just said no, that's not enough, and walked away. Exactly. It was a take it or leave it. It was not a negotiation. The Forest Service and the appraisers – How is that not a negotiation? I don't have to sell you my property. You're not offering me enough money. I'm leaving. Well, that's a take it or leave it as I see it. That is, you either pay – you either take $5 million or there's no sale. Or you go find another buyer. Well, certainly that would have been an option, Your Honor. What I'm saying is that Hen and Cam believed what the Forest Service told them, that they have this complicated and sophisticated process for valuing properties, that it's statutorily required, that it's intended to protect both sides, seller and buyer. You're entirely correct, Your Honor. One of the purposes of the Yellow Book, which applies to all appraisals done for the federal government in land acquisition cases, that it's there both to protect the public against paying too much but to protect the seller against receiving too little. It is a neutral process that the Forest Service did not follow. And what they're asking this court to affirm is they don't have to follow that process. They can tell people, yes, we did a Yellow Book appraisal. Yes, this is the price, and we've reviewed it, and we've approved it, and you don't know what you're talking about. So then you're relying on representations, and the contract specifically says that we are relying on no representations that were made to us by the government. No, the representation is in the contract itself, shall be supported by a Yellow Book. Right, but you're also saying that they told your clients you don't know what you're doing, you're stupid, you're ignorant to the process, rely on us, and they can't do that because the contract says you can't rely on them. Yes, so let's go to waiver. And the court asks, what is the act? Hold on a second. Just to be clear about this, the representation that you're relying on is the representation in the contract, not the representations that they made outside of the contract. Yes. Yes? Yes. And so the relevance of the back and forth that we've talked about is that the government said why Hanenkam didn't believe they were getting a Yellow Book compliant appraisal. And the principals in Hanenkam testified, yes, we did. We believe what we were hearing from the Forest Service. And that's relevant only because it relates to the government's waiver argument. We go back to conduct, and I think, again— If we go back to conduct and look at equitable estoppel, do you agree that the lower court provided the right standard by requiring the government had to prove that there was an intent to defraud on the part of your client by accepting this offer to get estoppel? Because I don't ever read that in equitable estoppel requirements. No, Your Honor. That is not the proper standard, and it's not the standard the trial court used. The proper standard is misleading conduct. Intentional misleading conduct. I mean, he was basically saying they had to be doing this with intent. Well, they intended to sign a contract. It wasn't something that someone slipped in and out. Of course they did. But what was misleading about signing a contract to sell property, in the belief that the purchase price was based on, was the amount found in a Yellow Book compliant appraisal, which was done because the statute requires it, because it's fair to both sides. If you don't have that appraisal, then that purchase price is an arbitrary number. It's not statutorily consistent, and it's not fair to either side because it's not the right price. It's not a Yellow Book compliant appraisal. Let me ask you a question. So the Court of Federal Claims, in finding that this was not a Yellow Book compliant appraisal, relied on various features of the appraisal. Correct. Is it accurate to say that your client was aware of each of those features on which the Court of Federal Claims relied to find it noncompliant? Well, not aware that they were noncompliant. No, no, I understand that, but just aware of the facts on which the Court of Federal Claims relied. Actually, yes. I can't say that there was any particular fact that the clients were unaware of. They just got convinced by the Forest Service appraisers that this was Yellow Book compliant. And there was no question. The government defended it as Yellow Book compliant clear through this trial. There is no question that at any point, anybody, there is no evidence that says at any point that the hand-in-hand people believed that this was not Yellow Book compliant appraisal determined appropriately until months after the transaction closed. And that is the vice in closing a transaction that did not comply with the law, did not comply with the process, and came up with an appraised value which the trial court found was about half of the actual fair market value of the property had it been Yellow Book compliant appraised. So to stick the sellers with a price that was not properly determined by the Yellow Book under any circumstances and didn't come up with a correct valuation is to deprive them, as the trial court found, of the fair market value of the property. Okay, but the contract did not provide that they would be paid fair market value. It did not, as the court said. It said the sales price would conform to Yellow Book. Okay, do you want to spend a minute on your cross bill? Yes, if I may, Your Honor. Quite simply, trophy properties are something more than simply high-end residential. That is, when an appraiser determines a highest and best use, be it residential, commercial, industrial, whatever, there are gradations within that, obviously. And even high-end residential has a higher and a lower end and a stratum in between, and trophy properties are right at the top. The trial court's error in the valuation was simply saying, although this has been determined to be a trophy property by Mr. Doré, by Ms. McAuliffe, the review appraiser, I'm not going to award any premium for that. That is a single item of damage that should have been awarded, and our request is that the court affirm the judgment of the trial court, with the exception of reversing for the determination of the appropriate premium for a trophy property. Okay, thank you. Thank you, Your Honor. Mr. Long, you have two minutes here. Okay, thank you, Your Honor. Just a few points in response, Your Honor. So, first of all— I'll start it off. Can you also address and respond to his arguments about compliance with the applicable statutes as well? Yes. So, the— The statute was designed to protect the seller as well as the government, right? Yes. I think if we look at— Yes, that's a yes. Yes, the Uniform Act talks about consistently in federal appraisals and protecting the federal taxpayer and also protecting federal landowners. There's something about this, I believe, that 42 U.S.C. 4651, which describes sort of the purpose of these appraisals. So, yes, landowners are among the population that are to be protected, but so is the federal FISC and consistent treatment and things like that. With respect to the statutory point— So, first of all, we don't view the trial court as having found a violation of a statute, but putting that aside, there's no reason that those—any statutory rights couldn't also be waived. So, meaning we fall back on the same facts, the same pre-transaction conduct, and that demonstrates that, in this instance, Hanningham, as the owner of its parcel, was best positioned to decide value. If we focus on fair market value, I think it's described in SNPLMA, the Southern Nevada Land Act. It is best positioned to decide the price at which it wants to sell. And having made the choice it made, it no longer has any ability to fall back on this contractual language or any statutory claims in order to undo this consummated transaction. With respect to sophistication, I think that speaks to it. Their landowners, as we explained, they're not unsophisticated on a personal level. They're familiar with business transactions. One of them, one of the principals is an investment banker. They understood what they were doing, and they're landowners. They—to, I think, one of the court's questions, they proposed—Duray, Hanningham proposed Duray initially after the first appraisal came back lower than Hanningham liked. But they didn't—Mr. Mazzullo's right, and I was wrong, but they didn't have their own appraiser at that point. They—well, they chose Mr. Duray, but Mr. Duray's brief was to prepare an appraisal for Forest Service Review. And Hanningham provided Mr. Duray with all these binders. Yeah, but they didn't have their own appraiser. They did not— Until after the transaction was completed. They did not—the record doesn't show that they independently retained an appraiser to compete with Duray. They certainly could have, obviously, but they didn't. They made the choice to go forward on the facts they had. With respect to the— I want to keep focusing. I mean, we keep going back to whether or not you breached a contract and didn't give them a— but the question here, as far as I can tell, was you had affirmative defenses of equitable estoppel and waiver. And with the equitable estoppel, it appears—and I think counsel on the other side has agreed. The court applied the wrong standard, required that there be an intentionally misleading conduct on the part of the party to be estopped. That's not a requirement, but their argument, I gather, was, well, we were just so naive, we didn't know any better, so we can't be estopped. That is how I understand it as well, Your Honor. And I don't think factually that carries any water, given their position as a landowner here and other facts. And I think as a matter of law, we expect selling landowners to understand their parcel and to make a decision. And so it's misleading when they raise these issues and then voluntarily drop them. I would point the court—with respect to whether Hanikem knew these issues pre-transaction, I'd point the court to the Yellow Book criticisms that Hanikem proffered to the Forest Service. The key material is in Appendix 1302 to 1321. They go point for point. Conditions of the transaction, privacy and things like that, whether or not it was a sale to the government, size of parcels, all that stuff is covered. They did it all pre-transaction, so they did know all of these issues and dropped them. Finally, my time is up. I'll say with respect to the cross-appeal, they're looking for a do-over. They failed in their damages showing, and they have not shown that the court failed to consider anything. Trophy property is not a highest and best use. Our expert testified to that. It's just a marketing description. Highest and best use is how you use the property. For example, residential compound, at which point you look for comparables with similar aspects. So location, developability, things like that. So the trophy property concept gets them nowhere on this, and there's no reason to demand for further damages. Okay, thank you. Thank you. Thank both counsel. The case is submitted.